JODI LINKER
Federal Public Defender
Northern District of California
GABRIELA BISCHOF
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 436-7700
Facsimile: (415) 436-7706
Email: Gabriela_Bischof@fd.org

Counsel for Defendant Arteaga

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

WILMER ARTEAGA,

Defendant.

**Case No.:** CR 22–101 WHO

**REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS**

**Court:** Courtroom 2, 17th Floor
**Hearing Date:** November 3, 2022
**Hearing Time:** 1:30 a.m.

## TABLE OF CONTENTS

**TABLE OF CONTENTS** .......... i

**TABLE OF AUTHORITIES** .......... i

**INTRODUCTION** .......... 1

**ARGUMENT** .......... 1

A. Mr. Arteaga Was Seized When The Officers Had Him Put His Hands Up; No Reasonable Suspicion Existed At This Point .......... 1

1. Mr. Arteaga Was Seized Almost Immediately .......... 1

2. The Officers' Claims That They Believed Mr. Arteaga Recently Exited The BMW Are Not Supported By the Evidence .......... 2

3. The Officers Immediately Knew Mr. Arteaga Was Not Black And Any Initial Suspicion Dissipated Before The Seizure .......... 4

4. The Government's Cited Cases Are Inapposite .......... 6

B. Mr. Arteaga Was Seized When The Officers Tackled, Handcuffed, And Frisked Him In The Street; No Reasonable Suspicion To Stop Or Frisk Existed At This Point And Mr. Arteaga's Reaction To Their Approach Did Not Create Reasonable Suspicion .......... 7

C. Mr. Arteaga Was Arrested When The Officers Tackled, Handcuffed, and Frisked Him; No Probable Cause Existed At This Point .......... 8

D. Officers Had Insufficient Suspicion To Perform A Second Frisk Of Mr. Arteaga On The Sidewalk; The Incriminating Statements He Made During That Search Are Fruit Of The Poisonous Tree .......... 9

E. Mr. Arteaga Need Not Establish Standing; All Searches Subsequent To His Initial Unlawful Detention Are Tainted .......... 10

1. The Automobile Exception Does Not Justify The Search of The BMW or the Backpack .......... 11

2. The Drug Dog Did Not Provide Probable Cause To Believe Drugs Were In The Car .......... 12

3. Officers Were Not Entitled To Conduct An Inventory Search Of The Vehicle .......... 13

F. An Evidentiary Hearing Is Required .......... 14

**CONCLUSION** .......... 14

# TABLE OF AUTHORITIES

**Supreme Court Opinions**

*Byrd v. United States*, 138 S. Ct. 1518 (2018) .................... 11

*California v. Carney*, 471 U.S. 386 (1985) .................... 11

*Florida v. Harris*, 568 U.S. 237 (2013) .................... 12, 13

*Florida v. Jardines*, 569 U.S. 1 (2013) .................... 11

*Illinois v. Wardlow;* 528 U.S. 119 (2000) .................... 6

*Miranda v. Arizona*, 384 U.S. 436 (1966) .................... 9

*United States v. Jones*, 565 U.S. 400 (2012) .................... 11

*Wong Sun v. United States*, 371 U.S. 471 (1963) .................... 10

*Ybarra v. Illinois,* 444 U.S. 85 (1979) .................... 4

**Federal Court Opinions**

*Gillis v. City & Cnty. of San Francisco;* 2011 WL 4404138 (N.D. Cal. Sept. 21, 2011), aff'd, 560 F. App'x 665 (9th Cir. 2014) .................... 6

*Miranda v. City of Cornelius*, 429 F.3d 858 (9th Cir. 2005) .................... 13

*Moreno v. Baca*, 431 F.3d 633 (9th Cir. 2005) .................... 2, 3

*Powell v. Staycoff*, 2019 WL 2524771 (D. Minn. June 19, 2019) .................... 5

*Ramirez v. City of Buena Park*, 560 F.3d 1012 (9th Cir. 2009) .................... 7, 8

*Thomas v. Dillard*, 818 F.3d 864 (9th Cir. 2016) .................... 8, 9

*United States v. Bain*, 874 F.3d 1 (1st Circuit 2018) .................... 11

*United States v. Brown*, 996 F.3d 998 (9th Cir. 2021) .................... 1-2

*United States v. Caseres*,
533 F.3d 1064 (9th Cir. 2008) .......... 13

*United States v. Hartz*,
458 F.3d 1011 (9th Cir. 2006) .......... 6

*United States v. Lopez*,
482 F.3d 1067 (9th Cir. 2007) .......... 7

*United States v. Manzo-Jurado*,
457 F.3d 928 (9th Cir. 2006) .......... 1

*United States v. Olivares-Rangel*,
458 F.3d 1104 (10th Cir. 2006) .......... 11

*United States v. Portillo-Reyes*,
529 F.2d 844 (9th Cir. 1975) .......... 11

*United States v. Ramirez*,
976 F.3d 946 (9th Cir. 2020) .......... 10

*United States v. Rodgers*,
656 F.3d 1023 (9th Cir. 2011) .......... 12

*United States v. Thomas*,
726 F.3d 1086 (9th Cir. 2013) .......... 12

*United States v. Thomas*,
863 F.2d 622 (9th Cir. 1988) .......... 5

*United States v. Twilley*,
222 F.3d 1092 (9th Cir. 2000) .......... 11

*United States v. Washington*,
490 F.3d 765 (9th Cir. 2007) .......... 10

*United States v. Wei Seng Phua*,
100 F.Supp.3d 1040 (D. Nev. 2015) .......... 10-11

*Washington v. Lambert*,
98 F.3d 1181 (9th Cir. 1996) .......... 8

## INTRODUCTION

Defendant Wilmer Arteaga respectfully submits this reply brief in support of his motion to suppress evidence obtained through an unlawful seizure and multiple illegal searches conducted by officers from the San Francisco Police Department.

## ARGUMENT

### A. <u>Mr. Arteaga Was Seized When The Officers Had Him Put His Hands Up; No Reasonable Suspicion Existed At This Point</u>

The government is guilty of exactly what it accuses the defense of – taking a divide and conquer approach that distorts the proper legal standard. Dkt. 38, Government's Opposition ("Opp'n") at 10. The government makes excuses for the scant information possessed by police when they seized Mr. Arteaga and glosses over the prompt dissipation of what little suspicion they initially possessed, repeatedly emphasizing that their suspicions grew later on in the investigation. In determining whether reasonable suspicion existed, courts must take into consideration "both factors weighing for and against reasonable suspicion." *United States v. Manzo-Jurado*, 457 F.3d 928, 938 (9th Cir. 2006). Evaluating each Fourth Amendment event in turn, it is clear that the officers lacked the necessary level of suspicion at every stage. The cases that the government cites in support of their assertion that a "myriad of articulable facts" add up to reasonable suspicion all rely on additional factors not present here.

#### 1. Mr. Arteaga Was Seized Almost Immediately

The government concedes that Mr. Arteaga was seized when officers handcuffed him, but he was actually seized earlier than that. Opp'n at 15. Mr. Arteaga was seized when officers initially approached him and Officer O'Brien ordered him to "Put your hands on your head!" "Don't start walking away!" Dkt. 33, Ex. D, O'Brien BWC at 00:37-01:43. Mr. Arteaga submitted to the show of authority. Mr. Arteaga, who had been walking into the street, moved back toward Officer O'Brien. *Id.* Officer O'Brien radioed that he was detaining a suspect. *Id.* Mr. Arteaga reached into his pocket and pulled his cell phone out, and held it in his hand above his head. *Id.* After that, Officer Sarcos shouted, "Get your hands out of your pockets!" *Id.* Mr. Arteaga did not return either hand to a pocket after Officer Sarcos ordered him not to and kept his hands up before placing them on his head. *Id. See*

*e.g. United States v. Brown*, 996 F.3d 998, 1005 (9th Cir. 2021)(seizure occurred when officer ordered defendant to stand up and turn around).

While it is true that Mr. Arteaga was found in the Tenderloin close in time after the shooting, that was also true of every person in that bustling area at that hour, and thus, could not add much particularity to the level of suspicion. During this initial seizure, officers knew that the BMW matched the make and color of the suspect vehicle but did not match the license plate or model (a 2-door instead of a 4-door), and that Mr. Arteaga was a Latino man with a thick Spanish accent standing outside of it. The officers did not have a match on the vehicle *or* the suspect. Accordingly, the officers did not have reasonable suspicion to detain Mr. Arteaga at this point and each search that followed this impermissible seizure, including the search of the vehicle, was fruit of the poisonous tree.

**2. The Officers' Claims That They Believed Mr. Arteaga Recently Exited The BMW Are Not Supported By the Evidence**

The government attempts to distinguish Mr. Arteaga's case from "mere presence" cases by asserting that the officers suspected Mr. Arteaga had recently exited the BMW. The government argues that they came to that conclusion because 1) Officer Sarcos heard Officer O'Brien say he saw someone in the BMW as they approached, 2) both officers now claim they saw the interior lights go on and off in the BMW, and 3) because Mr. Arteaga was alone next to the BMW. *See e.g.* Opp'n at 11, 12. None of these claims are well supported by the evidence. As a result of the dark night, the flashing lights of their patrol vehicle, and dark tinting on the BMW, the officers struggled to see as they approached the BMW and exited their vehicle, and any assertions to the contrary conveyed in Officer O'Brien and Officer Sarcos's declarations are undermined by the revisions and additions made to Officer O'Brien's account, the conflicts between the officers' accounts, and by the BWC footage of both officers. The government's after the fact justification that the officers were reasonable in believing that Mr. Arteaga recently exited the vehicle because surveillance footage "corroborates these accounts" is unconvincing. Opp'n at 4. The legality of any seizure or search must be assessed only based on the information known to officers at the time of the seizure or search in question. *Moreno v. Baca*, 431 F.3d 633, 639 (9th Cir. 2005). Footage taken from high above the scene which

incorporates moments when the officers were not even looking at the BMW, is not persuasive evidence of what officers perceived in the moment, particularly given the other contradictory video and prior inconsistent statement evidence.

Officer O'Brien wrote his initial report seven hours after Mr. Arteaga's arrest, and memorialized in it that when he initially spotted the BMW, he "was not able to see if the vehicle was occupied." Dkt. 33, Ex. A, O'Brien Report, WA-16; WA-22. In Officer Sarcos's September 27, 2022, declaration, written over ten months after the incident, she recalls that Officer O'Brien stated that he saw a person in the vehicle when they spotted the BMW. Dkt. 38-4, Sarcos Decl., ¶ 2. Officer O'Brien's declaration does not include his alleged statement. Dkt.38-3, O'Brien Declaration.

In his initial report, Officer O'Brien never stated that the interior lights of the vehicle were on or turned on and off. Dkt. 33, Ex. A, O'Brien Report, WA-16; WA-22. In a supplemental report he wrote 20 days after the incident and after reviewing the surveillance footage, he made a correction to his initial report, stating "due to my angle of contact out of the patrol vehicle and available ambient lighting" he'd been mistaken in his original report when he wrote that the car door was open. *See* Dkt. 33, Ex. B, O'Brien Supp. Report, WA-282. Although he had the opportunity to jog his memory and correct any omissions in that supplemental report, he again failed to mention that he noticed that the interior lights to the vehicle turned on and off. *Id.* It was only ten months after the incident and after multiple chances to memorialize the event, that he spontaneously recalled that "I also saw the lights inside the car turn on and off, potentially due to a car alarm and suggesting that the car had been recently exited." Dkt. 38-3, O'Brien Decl., ¶ 7. Moreover, the assertion that the officers saw the BMW's interior lights on is contradicted by the officers' BWC, which shows that the windows were too heavily tinted and no interior light is visible as the officers approach Mr. Arteaga. *See e.g.* Dkt. 33, Ex. E, Sarcos BWC at approx. 0:00-0:05; Ex. D, O'Brien BWC at approx. 00:34-00:45. While the officers may have honestly believed that Mr. Arteaga recently exited the vehicle, the available evidence shows that that belief was unreasonable because it was premised solely on his proximity to the vehicle, not on any stronger evidence that he was its possessor.

Mr. Arteaga was the closest person to the BMW, but he was also not the only person near the vehicle when officers approached – another man can be seen squatting by the wall directly across

from the BMW. See Dkt. 33, Ex. D, O'Brien BWC at approx. 00:39-00:45, screenshotted and annotated below.




The government's assertion that the officers had reason to believe Mr. Arteaga had just exited the white BMW doesn't hold up to scrutiny. At best, what they could perceive was that Mr. Arteaga – who did not match the description of the suspect - was on a populated public sidewalk at a reasonable hour, in close proximity to a vehicle suspected to be involved in a recent crime. As such, that brings his position on a public sidewalk much closer to the bar in *Ybarra v. Illinois* than the government admits. 444 U.S. 85 (1979), Opp'n at 11-12. Nor does the fact that the police failed to stop others in the vicinity, including the other person next to the vehicle, alter the analysis, because Mr. Arteaga was not "alone next to the BMW." *Id.*

**3. The Officers Immediately Knew Mr. Arteaga Was Not Black And Any Initial Suspicion Dissipated Before The Seizure**

The government's insistence that the discrepancy between Mr. Arteaga's race and the suspected shooter's race "did not obviate officers' reasonable suspicions that Arteaga matched the suspect's general description" is farfetched. Opp'n at 12. The government offers two justifications: either that it was reasonable for the officers to fail to notice that Mr. Arteaga was not black or that it

did not matter that he was not black because the reporting officer could have mistaken the suspect's race and the other facts known to officers were sufficient to generate reasonable suspicion or probable cause. Opp'n at 13, citing a single district court decision, *Powell v. Staycoff*, 2019 WL 2524771 at *11 (D. Minn. June 19, 2019).

First, Officer Sarcos appears to insist that she did not realize Mr. Arteaga was plainly not black despite the streetlights, police flashing lights, and her close proximity to Mr. Arteaga. Dkt. 38-4, Sarcos Decl. ¶ 8. Officer O'Brien does not comment on the matter in his declaration. The government argues that, in the evening conditions, it is unreasonable to expect any officer to recognize that Mr. Arteaga was not a black male adult. Opp'n at 13. Even if his skin was somehow obscured by the lighting in the area and the officers' initial distance from him, Mr. Arteaga speaks with a heavy Spanish accent, which is so identifiable that although Mr. Arteaga had been speaking nothing but English, an officer later speaks to him in Spanish, unprompted. Mr. Arteaga began speaking with the officers as soon as they spoke to him, and that alone should have prompted the officers to realize he was not the suspect they sought. Dkt. 33, Ex. D, O'Brien BWC at approx. 00:34-00:55.

Nor was it permissible for the officers to simply disregard the discrepancy, as the government suggests, because the reporting officer might have been mistaken and Mr. Arteaga was standing next to a white BMW. The "suspect's general description" was a black male adult. The broadcasted description was unqualified – dispatch did not indicate that the suspect was only possibly black, as in *Powell v. Staycoff*, but was unequivocally a black male adult. The dispatch gave officers no reason to question the validity of the identification of the suspect as black. Officers may not simply choose to ignore relevant facts that contradict their desire to search a particular individual, especially where, as here, the suspect's race was the only meaningful physical descriptor they had. *See e.g. United States v. Thomas*, 863 F.2d 622, 628 (9th Cir. 1988). The government's argument that the totality of other facts known to the officers was sufficient to overcome the dissipation of suspicion is also unsupported because at the point they seized Mr. Arteaga they did not have enough information to know that the white BMW was the suspect vehicle, nor, as set forth above, did they have a reasonable basis to believe Mr. Arteaga controlled the white BMW.

**4. The Government's Cited Cases Are Inapposite**

Each of the cases the government cites to support their arguments involve a finding of reasonable suspicion where the officers were aware of more relevant facts than the officers were here. The government first attempts to explain away the fact that the license plate reported over dispatch did not match the BMW encountered by Officers O'Brien and Sarcos by citing *United States v. Hartz,* 458 F.3d 1011 (9th Cir. 2006). Opp'n at 9. In *Hartz*, police were investigating reports that a 1977 Chevrolet had recently been stolen at gunpoint. Although (as in this case) the Chevy the officers eventually stopped had a different license plate number, in that case the license plate appeared to be new and was attached to the truck with "zip ties," suggesting that the license plate had been switched, and both officers testified that "carjackers might have switched license plates with a similar-looking truck to increase their chance of avoiding capture." *Id.* at 1017. In that case, although the plates on the stopped vehicle did not match the stolen vehicle's plates, the plates themselves independently added to the officers' reasonable suspicions that the truck had been recently stolen. *Id.* Here, no such factor made up the difference.

Next, the government cites *Gillis v. City & Cnty. of San Francisco* for the proposition that "reasonable suspicion [existed] when, among other things, a mugging had been reported a short time earlier, two blocks south." Opp'n at 10; 2011 WL 4404138, at *3 (N.D. Cal. Sept. 21, 2011), aff'd, 560 F. App'x 665 (9th Cir. 2014). What the government fails to mention is that the "other things" that added up to reasonable suspicion were a description of the muggers as a group of three black males in dark clothing, which -unlike here - exactly matched the description of the suspects that were arrested.

The government cites to *Illinois v. Wardlow* for the proposition that the Court can consider the high crime neighborhood where Mr. Arteaga was found as a factor in its *Terry* analysis. Opp'n at 10; 528 U.S. 119, 123 (2000). But the government mistakes *Wardlow*'s significance. If a suspect is present in a high crime area then that may add to the suspicion that *a crime is being committed* but not to the suspicion that a particular suspect committed an already known crime. While admittedly, the fact that the shooting occurred in the Tenderloin and Mr. Arteaga was found in the Tenderloin can add to the officers' suspicion, the fact that the government asserts, without supporting data, that the Tenderloin is a high crime area does not logically add anything to the officers' suspicion that "an

offense has been or is being committed *by the person being arrested*." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007), emphasis added. Nor is Mr. Arteaga's initial reaction to being seized by police anything like the headlong flight that generated reasonable suspicion to detain in *Wardlow*.

The officers' warrantless seizure of Mr. Arteaga violated the Fourth Amendment, and all fruits of that seizure including the search of his person, the white BMW, and the backpack within it must be suppressed.

### B. Mr. Arteaga Was Seized When The Officers Tackled, Handcuffed, And Frisked Him In The Street; No Reasonable Suspicion To Stop Or Frisk Existed At This Point And Mr. Arteaga's Reaction To Their Approach Did Not Create Reasonable Suspicion

Even if Mr. Arteaga was not seized until he was tackled and handcuffed, as the government concedes (Opp'n at 15), the officers' interaction with Mr. Arteaga did not add to the insufficient suspicion they possessed. The BMW on Ellis and Mr. Arteaga himself still did not match the descriptions broadcasted to the officers, and no further facts emerged at that point linking Mr. Arteaga to the BMW. "Every pat-down is unreasonable unless it is supported by the officer's reasonable suspicion that *the person to be frisked* is armed and dangerous." *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1023 (9th Cir. 2009), emphasis added. While officers certainly had cause to believe a gun crime had taken place and that its perpetrator was armed and dangerous, the minimal nexus between the shooting and Mr. Arteaga undermined any reasonable suspicion that *he* was armed and dangerous.

The government argues that Mr. Arteaga's reaction to being seized constituted an evasive "precursor to flight" which increased officers' suspicions that he was the shooter. Opp'n at 17. In the few seconds the officers gave him to respond before tackling him, Mr. Arteaga largely follows their orders: after Officer O'Brien tells him to stop walking away, he walks back toward Officer O'Brien, and after being told not to put his hands in his pockets he does not. Dkt. 33, Ex. D, O'Brien BWC at 00:37-01:43. The government makes much of the fact that it takes him several seconds to put his hands on his head, but to conclude that he was uncooperative or intended to flee the finder of fact would have to ignore that he simply puts his hands *in the air* rather than on his head and at one point, makes a small bow of submission. *Id.* As soon as he realizes that he has not understood the command

correctly, he places his hands on his head. *Id.* Mr. Arteaga engages submissively with both officers, turning from Officer Sarcos back to Officer O'Brien and back and forth again. *Id.* The officers also assert that just before Officer O'Brien tackled Mr. Arteaga, he turned his back to them, which led them to believe he might flee. Dkt. 38-4, Sarcos Decl. at ¶ 9; Dkt. 38-3, O'Brien Decl. ¶¶8-9. A closer look at the BWC shows that rather than turning away, Mr. Arteaga actually turned completely around, an act which does not indicate he intended to run in the other direction. Dkt. 33, Ex. E, Sarcos BWC, 00:00-00:07.

The government also argues that "Arteaga here reached for his pocket, potentially signaling he was reaching for a weapon" but he only reached for his pocket once (before Officer Sarcos told him not to) and immediately pulled out his cell phone, which he then held until officers knocked it from his grasp as he was placed in handcuffs, thereby quelling any emerging fear that he was reaching for a weapon. Dkt. 33, Ex. D, O'Brien BWC at 00:37-01:43. Moreover, his hands were empty but for the cell phone and otherwise plainly visible up until the time Officer O'Brien took him to the ground, negating any inference that he was armed. *Thomas v. Dillard*, 818 F.3d 864, 883 (9th Cir. 2016), as amended (May 5, 2016)(that detainee faced officer with his hands fully visible was a factor that weighed against reasonable suspicion he was armed and dangerous, despite violent nature of crime suspected).

### C. <u>Mr. Arteaga Was Arrested When The Officers Tackled, Handcuffed, and Frisked Him; No Probable Cause Existed At This Point</u>

The government argues that officers' aggressive tactics did not amount to an arrest of Mr. Arteaga in large part because the suspected shooter was armed and dangerous. Opp'n at 15-16. Again, as argued above, the government ignores the deficient connection between the suspected shooter and Mr. Arteaga *at the time* officers tackled and handcuffed him. "[T]he specificity of the information that leads the officers to suspect that the individuals they intend to question are the actual suspects being sought" is a critical factor in determining whether an individual is detained or arrested. *Washington v. Lambert,* 98 F.3d 1181, 1189-90 (9th Cir. 1996). At this point, the officers lacked even reasonable suspicion.

The government forges onward with the unstable logic it employed in arguing that the

discrepancy between the race of the suspected shooter and Mr. Arteaga was of minimal import. It next argues that "it belies logic to say that a failure to find a weapon on his person dissipated the officers' suspicions" because the shooter could simply have stashed the weapon elsewhere. Opp'n at 14. Certainly, a reporting party *could have* misperceived the race of a suspect, the license plate of a vehicle, the model of a car, and there could be any number of creative explanations for why an investigation kept turning up evidence that dissipated, rather than increased, the quantum of suspicion. But a totality of the circumstances analysis does not allow officers to simply disregard inconvenient facts. "Officers may not cherry pick facts to justify the serious Fourth Amendment intrusion a frisk imposes." *Thomas v. Dillard*, 818 F.3d at 877. The officers expected to find an armed suspect and upon frisking Mr. Arteaga, did not find him to be armed. Viewed in light of the totality of the circumstances, this event reduced the amount of suspicion far below what was necessary to continue the arrest.

### D. Officers Had Insufficient Suspicion To Perform A Second Frisk Of Mr. Arteaga On The Sidewalk; The Incriminating Statements He Made During That Search Are Fruit Of The Poisonous Tree[1]

After officers failed to find a weapon, their suspicion dissipated but they nevertheless frisked Mr. Arteaga again after placing him on his back on the sidewalk. As they conduct the second frisk, they speak to and toward him. The officers' insistence that Mr. Arteaga's statements that he had dope and that he had driven the white BMW were "unprompted" are not supported by the BWC. Compare Dkt. 38-3, O'Brien Decl., ¶ 11; Dkt. 38-4, Sarcos Decl., ¶ 11; Dkt. 38-5, Custdio Decl. ¶ 6; with Dkt. 33, Ex. E, Sarcos BWC, approx. 01:35-02:55. Far from being unprompted, Mr. Arteaga's statements are made as part of a conversation the officers are having with him and each other as they conduct the frisk. At 01:35, in order to assure his compliance with the search of his person, Officer Sarcos assures him, "We don't care if you have drugs" and tells the other officers Mr. Arteaga is squirming because there must be something he has that he doesn't want the officers to find. The officers continue to frisk Mr. Arteaga's coat and belly until he says "I got dope!" to put an end to their search. Another officer then asks if he has any weapons he shouldn't have and Mr. Arteaga says no. In response to Mr.

---

[1] Mr. Arteaga reserves the right to argue that his statements were taken in violation of *Miranda v. Arizona,* 384 U.S. 436 (1966) in a later motion.

Arteaga's denial, Officer Sarcos indicates toward the white BMW and says: "He came and got out of that car-" Only then does Mr. Arteaga make the statements that connect him to the vehicle.

"It is well established that, under the 'fruits of the poisonous tree' doctrine, evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible, despite a person's voluntary consent, unless the evidence obtained was 'purged of the primary taint.'" *United States v. Ramirez*, 976 F.3d 946, 959–60 (9th Cir. 2020), citing to *Wong Sun v. United States*, 371 U.S. 471 (1963). "The test for admissibility of the evidence under these circumstances is two-fold: not only must the consent be voluntary, but it must also be 'sufficiently an act of free will to purge the primary taint' " of the initial constitutional violation. *Id.*, internal citations omitted. Mr. Arteaga's statements, even if made voluntarily, are inadmissible because they were obtained through "exploitation of illegality," here, the immediately preceding illegal seizure. To determine whether the statements were purged of the primary taint, a court must look to three factors: "temporal proximity," "the presence of intervening circumstances," and "the purpose and flagrancy of the official misconduct." *Id.,* citing *United States v. Washington*, 490 F.3d 765, 776 (9th Cir. 2007).

Even in the absence of particularly purposeful or flagrant misconduct, the temporal proximity (within three minutes of the unlawful seizure) and the absence of any intervening circumstances lead to the inescapable conclusion that Mr. Arteaga's statements were obtained by exploitation of the illegality of his initial seizure and therefore, must be suppressed as fruit of the poisonous tree. *United States v. Johnson,* 626 F.2d 753, 759 (9th Cir. 1980).

### E. <u>Mr. Arteaga Need Not Establish Standing; All Searches Subsequent To His Initial Unlawful Detention Are Tainted</u>

The government asserts that Mr. Arteaga lacks standing to object to the search of the vehicle, but to succeed on a motion to suppress the fruits of a search on a tainted fruit theory, Mr. Arteaga need not establish standing. *See Wong Sun*, 371 U.S. at 488 (suppressing not only direct evidence seized illegally, but also evidence that derives via "exploitation of that illegality, or instead by means sufficiently distinguishable to be purged of the primary taint"); *United States v. Wei Seng Phua*, 100 F.Supp.3d 1040, 1055 (D. Nev. 2015)("If the government searches a third party's residence because of information it gained from an unconstitutional search . . .the defendant may challenge the

derivative search even though he would otherwise lack standing to challenge it"); *United States v. Olivares-Rangel*, 458 F.3d 1104, 1117 (10th Cir. 2006); *United States v. Twilley*, 222 F.3d 1092, 1097 (9th Cir. 2000) (where an initial traffic stop is unconstitutional, defendant-passenger may challenge the search of a third-party's vehicle as fruit of the poisonous tree). The government bears the burden to show that evidence is not fruit of the poisonous tree. *Twilley*, 222 F.3d at 1097. Here, the officers found each piece of evidence, including the key fob that opened the vehicle, as a result of the unconstitutional seizure and search of Mr. Arteaga's person. Each search, including the searches of the car and the backpack are tainted by the initial illegality. Dkt. 38-6, Tursi BWC, 05:17-05:59.[2] [3] The government bears the burden of proving otherwise.

**1. The Automobile Exception Does Not Justify The Search of The BMW or the Backpack**

The government attempts to meet this burden by arguing that the search of the vehicle was justified under the automobile exception. Opp'n at 22-23. The automobile exception allows warrantless car searches if police "had probable cause to believe [the car] contained evidence of a crime when they initiated their search." *Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018). A warrantless search under the automobile exception must be supported by the same probable cause that would be required for a warrant. *California v. Carney*, 471 U.S. 386, 394 (1985). "Probable cause exists when, under the totality of the circumstances, there is a fair probability that contraband

---

[2] At approximately 05:17, Sgt. Tursi asks "Is it locked? The car?" Another officer responds "Yeah." Then, at 05:55, Sgt. Tursi comes back from Mr. Arteaga's gurney with the key fob and states "Look at this that fell out of his pocket" and shortly thereafter, "There, it's unlocked."

[3] Clicking the key fob that fell out of Mr. Arteaga's pocket to determine whether it opened the white BMW was itself a warrantless search, opening the white BMW to conduct a search of the interior was another. By clicking the fob, the officers physically intruded upon private property for the purpose of obtaining information – the very definition of a property-based search. See *Florida v. Jardines*, 569 U.S. 1, 6 (2013); *United States v. Jones*, 565 U.S. 400 (2012) (search occurs when "[g]overnment physically occupie[s] private property for the purpose of obtaining information.") In this vein, there is no meaningful difference between an officer clicking a key fob to see if it unlocks a car, or an officer inserting a key into a lock to see if that key unlocks a door. See *United States v. Portillo-Reyes,* 529 F.2d 844, 848 (9th Cir. 1975)(under "reasonable expectation of privacy doctrine, . . . the insertion of [a] key into the door of [a vehicle] to see if it fit constituted the beginning of the search"); *United States v. Bain*, 874 F.3d 1, 14-15 (1st Circuit 2018)(holding, under *Jardines*, that an officer's actions testing a key in a lock of a door constitutes a "search" under *Jones*' property/trespass based theory.)

or evidence of a crime will be found in a particular place." *United States v. Rodgers*, 656 F.3d 1023, 1028 (9th Cir. 2011) (internal quotation marks omitted). Probable cause to arrest for a crime does not necessarily equate to probable cause to search for evidence of that crime. *Id.* at 1028-29. Sgt. Delaney (who was on-scene at the time of the search) summarized the suspected crime as follows: "[t]he driver of the white 2-door BMW exited the vehicle and we observed a black semiautomatic pistol in his right hand. I then heard the sound of two gunshots as the dark colored SUV sped away traveling westbound on Turk Street." Dkt. 33, Ex. C, Delaney Report, WA-7. Accordingly, the officers were looking for a single gun and the debris of two shots. By the time the vehicle was searched, officers had already found a gun on Mr. Arteaga and therefore had no cause to look for another. Moreover, the suspect stepped outside of the vehicle to shoot, making the possibility that shell casings from the shooting would be found *in* the vehicle nonexistent. By 6:46 p.m., well before the vehicle search, officers had already located a shell casing at the scene of the shooting and broadcasted the find over the radio, further diminishing any negligible suspicion that a shell casing would be found in the vehicle. Dkt. 33, Ex. F, CAD, WA-9. Accordingly, officers did not have probable cause to believe that evidence of the shooting would be found within the vehicle at the time they searched it.

**2. The Drug Dog Did Not Provide Probable Cause To Believe Drugs Were In The Car**

An alert to the presence of drugs by a reliable drug-detection dog can establish probable cause to search a vehicle, but that "depends on the facts and circumstances of each case." *United States v. Thomas,* 726 F.3d 1086, at 1096, 1098 (9th Cir. 2013). Evidence of a dog's satisfactory performance in a certification or training program is important, and "a defendant must have an opportunity to challenge such evidence of a dog's reliability . . .for example, [by] contesting the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty. So too, the defendant may examine how the dog (or handler) performed in the assessments made in those settings." *Florida v. Harris*, 568 U.S. 237, 247 (2013). Moreover, even assuming arguendo that the government can establish a dog's reliability, "circumstances surrounding a particular alert may undermine the case for probable cause – if, say, the officer cued the dog (consciously or not) or if the team was working under unfamiliar conditions." *Id.*

First, the government cannot prove K9 Cooper was adequately trained and a reliable source for drug detection because the government has produced no reports, training or certification records. Second, the government cannot meet its burden here because there is insufficient evidence that in this particular case, Cooper's actions allowed the officers to conclude that there was probable cause to search the BMW. Cooper's handler, Officer Montero's BWC does not capture Cooper as he initially allegedly alerts and has a behavior change outside the BMW, it only captures Cooper as he searches the interior of the vehicle. Reply Decl, Ex. G, Montero BWC. However, the portion of the search that the BWC does capture shows no discernible behavior change in Cooper. *Id.* Finally, the circumstances of the search also indicate that Cooper is not reliable. At one point, Officer Montero notes that Cooper is still alerting to the place in the vehicle where the backpack with fentanyl was – even though the backpack has been removed from the vehicle and no drugs remain. *Id.* at approx. 05:32. This is an indication that he may be conditioned to alert even when drugs are not present in order to obtain his reward.

At a minimum, the Court should grant an evidentiary hearing on this point. As to the issue of a drug-detection dog's reliability to establish probable cause with an alert, the Supreme Court instructs the district court to conduct a probable-cause hearing. "The Court should allow the parties to make their best case, consistent with the usual rules of criminal procedure. And the court should then evaluate the proffered evidence to decide what all the circumstances demonstrate." *Harris,* 568 U.S. at 248.

### 3. Officers Were Not Entitled To Conduct An Inventory Search Of The Vehicle

Contrary to the government's assertion, officers were not entitled to do an inventory search of the vehicle because the tow served no community caretaking function. The community-caretaking exception dictates that an officer cannot order impoundment when "the location of the vehicle does not create any need for the police to protect the vehicle or to avoid a hazard to other drivers." *Miranda v. City of Cornelius*, 429 F.3d 858, 864-65 (9th Cir. 2005); *United States v. Caseres*, 533 F.3d 1064, 1075 (9th Cir. 2008). The vehicle was legally parked, not impeding traffic in any way, and locked, and its removal therefore served no community caretaking function. The

government has not carried its burden to show that any of the evidence is not fruit of the poisonous tree.

**F. <u>An Evidentiary Hearing Is Required</u>**

The parties' submissions demonstrate there are material factual disputes that require the Court to hold an evidentiary hearing. Specifically, as set forth in greater detail above, there are factual disputes about whether the officers reasonably could have believed Mr. Arteaga recently exited the BMW, if and when they noticed that his race did not match the suspect's race, and whether K9 Cooper was properly trained, properly handled, and whether and how reliably he alerted. These disputes cannot be resolved by exclusive reliance on the BWC because the officers' statements sometimes conflict with the BWC, the BWC conflicts with the surveillance video, and in the case of the drug dog, some of the events being challenged are not captured on the BWC. Many of the disputes relate to contradicting statements within and between different officers' reports, and contradictions between those statements and the BWC. Because the disputes relate to the credibility of witnesses or their ability to perceive, an evidentiary hearing is required.

**CONCLUSION**

For the reasons stated above, Mr. Arteaga respectfully requests that this Court issue an order suppressing evidence, or alternatively order an evidentiary hearing in this case.

Dated: October 13, 2022

Respectfully submitted,

JODI LINKER
Federal Public Defender
Northern District of California

/S

GABRIELA BISCHOF
Assistant Federal Public Defender